# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

PATRICIA HOLMES      )
                  )
v.                    )       NO. 3:05-0633
                  )       JUDGE CAMPBELL
TELECHECK INTERNATIONAL, INC. )      MAGISTRATE JUDGE GRIFFIN
and TELECHECK SERVICES, INC.    )

## MEMORANDUM

Pending before the Court are the parties' renewed cross-motions for summary judgment (Docket Nos. 329 and 349) to which responses and replies have been filed. Defendants seek oral argument on their summary judgment motion. (Docket No. 347).

Also pending before the Court are a number of motions filed by Defendants related to the admissibility of certain evidence submitted by Plaintiff in support of her pending motion for summary judgment: Renewed Motion to Strike and/or Exclude Third Party Checkwriter Affidavits (Docket No. 342); Renewed Motion to Strike and/or Exclude Documents from the Houston Better Business Bureau (Docket No. 343); Renewed Motion to Strike and/or Exclude Plaintiff's Supplemental Affidavit and Second Supplemental Affidavit (Docket No. 344); Renewed Motion to Strike and/or Exclude the Affidavit of Julia Trotman (Docket No. 345); and Renewed Motion to Strike and/or Exclude Expert's Supplemental Report (Docket No. 346). Plaintiff opposes these motions.

## I.    *Introduction*

This case centers around six checks written by Plaintiff Patricia Holmes and presented by her as payment to four merchants during the period of August 2003 to June 2005. Five of the checks were declined by the merchants at the point of sale upon the recommendation of

TeleCheck.   With regard to the other check, TeleCheck initially issued a code requiring the merchant to whom Holmes had presented the check to contact TeleCheck to provide additional information regarding the transaction.  The merchant ultimately accepted the check.

As a result of TeleCheck's issuance of those recommendations and as a result of TeleCheck's subsequent conduct as Holmes sought additional information from TeleCheck, Holmes brings this action against Defendants TeleCheck International, Inc. and TeleCheck Services, Inc. (collectively referred to as "TeleCheck" unless otherwise indicated), alleging various violations under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*. Plaintiff alleges that TeleCheck violated the FCRA when it (1) failed to follow reasonable procedures to assure maximum possible accuracy of the information contained in Holmes' file; (2) failed to respond to Holmes' requests for a file disclosure and for a copy of the report forming the basis for denying Holmes' checks; (3) failed to investigate/reinvestigate based on a dispute; (4) failed to provide adequate staffing and training to comply with the FCRA; (5) improperly requested, required, or otherwise obtained information from Holmes, namely her social security number; (6) wrongfully disseminated reports, file material and/or other information about Holmes to unauthorized or improper persons, parties, or entities; and (7) failed to include a "Summary of Rights" notice.

Plaintiff has filed a motion for summary judgment on the issue of liability only regarding the first, second, and third alleged violations identified above.  Plaintiff asks the Court to find that TeleCheck willfully or negligently violated the FCRA as to those specific claims.  Plaintiff seeks actual damages for emotional distress and humiliation.  She also seeks statutory and punitive damages for pain and suffering, mental anguish, emotional distress, embarrassment,

indignity, humiliation, and loss of enjoyment of life.  Plaintiff also seeks a declaratory judgment and permanent injunction against Defendants.

TeleCheck has filed a cross-motion for summary judgment on each of Holmes' claims as to liability and damages. Defendants also have filed a number of motions, all opposed by Plaintiff, regarding the admissibility of evidence offered by Plaintiff in support of her summary judgment motion.

The Court finds that oral argument is not necessary to the Court's resolution of the parties' motions.

## II.    *Overview of Facts*[1]

### A.    *Defendants' Business*

TeleCheck represents on its website that it is the "world's leading check acceptance company, providing electronic check conversion, check guarantee, check verification, and collection services to retail, financial institutions, and other industry clients."  (Docket No. 157, Plf.'s App., Tab 23 at 1-2).  According to Plaintiff, TeleCheck International, Inc. and TeleCheck Services, Inc. are  "consumer reporting agencies" under the FCRA that provide "consumer reports"[2] to merchants.   On its website, TeleCheck represents that its check verification service "helps merchants separate good check writers from bad ones," that its databases and risk

---

[1]All facts set forth in this Memorandum are taken from the parties' filings in support of their cross-motions for summary judgment and exhibits thereto.  All facts are undisputed unless otherwise noted.

[2]The FCRA defines a "consumer report" as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living . . . ."  15 U.S.C. § 1681a(d)(1).

3

management systems "identify not only bad check writing risks, but also good ones," and that it can predict "with unmatched accuracy the probability of a check being good." (Docket No. 157 at pp. 1-4). TeleCheck processes approximately 1.2 million check requests each day.

TeleCheck merchants run customers' checks through either a terminal or the cash register to send data to TeleCheck regarding the transaction. TeleCheck's computer system then processes the transaction by running that data through risk models, which draw from hundreds of variables to assess the riskiness of that transaction. According to TeleCheck, the risk models for each merchant are particular to that merchant and are based on the particular merchant's loss experience. TeleCheck typically does not have access to information concerning bank account balances.

Based on the results of the risk model for that particular merchant, TeleCheck then issues one of four numeric codes to the merchant via the terminal or cash register. TeleCheck characterizes these codes as "recommendations" to the merchant as to how to handle the transaction. After receiving one of TeleCheck's numeric codes, the merchant may choose to accept the check, reject the check, or provide additional information to TeleCheck. According to TeleCheck, the decision of check acceptance resides with the merchant, and merchants sometimes choose not to follow TeleCheck's recommendation.[3]

---

[3]However, TeleCheck training materials indicate that TeleCheck, not the merchant, issues check declines. *See* Docket No. 157, Plf.'s App., Tab 2, TeleCheck training materials, TC00795 (Frequently Asked Question verbiage given to customer care representatives "Customer: Is my check being declined by the merchant or by TeleCheck? Response: The decline is the result of TeleCheck's acceptance guidelines."); *see also* Plf.'s App., Tab 2, TeleCheck training materials TC000612 ("All declines are based on guidelines set by TeleCheck and only TeleCheck. DO NOT BLAME THE MERCHANT.")(emphasis in original).

4

**"Code 0"** indicates that the merchant should call TeleCheck to provide additional information. TeleCheck claims that a "Code 0" is not a recommendation to accept or decline a check; however, in TeleCheck internal documents, a "Code 0" is referred to as a decline. (Plf.'s App., Tab 2, TC002617).

**"Code 1"** is an approval code; according to TeleCheck, it is a recommendation to the merchant to accept the check.

**"Code 3"** is a decline code; according to TeleCheck, it is a recommendation to the merchant to decline the check based on an assessment of the risk of the transaction. When TeleCheck issues a "Code 3," TeleCheck instructs the merchant to provide the checkwriter with a "courtesy card." The "courtesy card" provides TeleCheck's contact information, including a toll-free number, and lists the specific identifying information TeleCheck requires to answer the checkwriter's questions.

**"Code 4"** is a decline code; according to TeleCheck, it is a recommendation to decline the check based on what the TeleCheck system suggests is an outstanding unpaid check or information that the specific bank account is closed. This case does not involve any "Code 4s."

TeleCheck collects information based on three unique identifiers: bank account number, driver's license number, and/or Social Security number. TeleCheck does not identify checkwriters by name, address, or telephone number because those identifiers may not be unique to that checkwriter. Plaintiff disputes that TeleCheck utilizes Social Security numbers in connection with its check verification and guarantee services and insists that TeleCheck collects consumers' Social Security numbers for improper purposes in violation of the FCRA.

**B.      *TeleCheck's Recommendations Regarding Holmes' Checks***

5

Holmes' claims are based on six check transactions.  Five of the transactions involved "Code 3" recommendations.   The other transaction involved a "Code 0."   With regard to the "Code 0," TeleCheck ultimately recommended that Holmes' check be accepted, and the merchant accepted the check.  The six check transactions were as follows:

**Check 1:**  On August 22, 2003, at 10 p.m. Holmes presented a check for $489.58 with her 8-digit Tennessee driver's license number  to Hecht's at the Cool Springs Galleria in Franklin, Tennessee.

TeleCheck issued a "Code 3" based, in part, on the number of checks Holmes had written (the "check velocity") in the preceding days and the fact that Holmes' check was for an amount six times the average check presented to that Hecht's location.  Holmes admits that, in the two days before the presentment of the Hecht's checks, she had written numerous checks, including three to TeleCheck merchants, two of which were presented to and accepted by Hecht's within the previous hour.

The "Code 3" decline was also based, in part, on a personal check written by Holmes to Swim 'N Sport that had been returned for non-sufficient funds in March 2003.

Hecht's declined the $489.58 check.[4]  The Hecht's clerk provided Holmes with TeleCheck's phone number.  Holmes immediately left the store and called the number.  After going through TeleCheck's IVR system and providing the requested information, Holmes was unable to reach a live operator and hung up out of frustration.  Holmes returned to Hecht's the

_____

[4]The check was actually declined 14 times over a span of approximately twenty minutes because the cashier ran the check multiple times.

following day and purchased the goods after Hecht's offered her (and she accepted) a Hecht's charge card. Holmes received a discount on the purchase for opening a Hecht's charge account.

**Check 2:** On August 26, 2003, Holmes presented a check for $51.91 to Borders in Brentwood, Tennessee. According to TeleCheck, Borders had elected, as part of its risk model, to have the TeleCheck system issue a "Code 3" recommendation if the checkwriter had received a "Code 3" risk-decline recommendation that was not overturned within the previous six days. Daniel Ahles testified that because the August 22, 2003 Hecht's "Code 3" had not been overturned, the TeleCheck system automatically transmitted a "Code 3" recommendation to Borders. Borders declined the check.[5] Holmes elected to then purchase the goods with a credit card.

**Check 3:** The next transaction about which Holmes complains occurred almost one year later, on August 14, 2004, when Holmes presented a check to Hecht's for $98.42. TeleCheck issued a "Code 0," requesting additional information. The parties dispute whether, and to what extent, any additional information was provided by Hecht's to TeleCheck. It is undisputed that the check was processed again, and, five to thirteen minutes later, TeleCheck issued a "Code 1" and Hecht's accepted the check.

**Check 4:** On May 21, 2005, Holmes presented a check to Arden B. for $170.43, using her 9-digit Tennessee driver's license number.[6] According to TeleCheck, because that driver's

---

[5]The check was actually declined 4 times because the cashier ran the check multiple times.

[6]In February 2002, the State of Tennessee changed from an 8-digit to a 9-digit driver's license numbering system. Individuals obtaining a Tennessee license for the first time received a 9-digit license number beginning with the digit "1." For Tennesseans holding existing licenses, however, a "0" was added to the beginning on their existing license numbers. Although the

7

license number was new to the TeleCheck system, that identifier appeared to be from a new checkwriter. For that reason TeleCheck issued a "Code 3" to Arden B.[7] Holmes purchased the goods with a credit card and started to leave the store.

Minutes later Holmes returned to the store and presented a second check, which was processed using Holmes' 8-digit expired Tennessee driver's license number. Based on the second check, thirteen minutes after TeleCheck's initial "Code 3" issuance, TeleCheck issued an approval recommendation. Arden B. accepted Holmes' check in exchange for the goods and the merchant removed the charge from Holmes' credit card account.

**Check 5:** On June 14, 2005, Holmes presented a check to Charlotte Russe for $89.98, using her 9-digit driver's license number. TeleCheck initially issued a "Code 3."[8] Holmes spoke with a TeleCheck employee at the point of sale, and TeleCheck changed the "Code 3" to a "Code 1." Charlotte Russe accepted Holmes' check in exchange for the goods.

**Check 6:** A little over one hour later, Holmes presented a check to Hecht's for $65.51, again using her 9-digit driver's license number. Like the Charlotte Russe check, the Hecht's check resulted in TeleCheck issuing a "Code 3."[9] Hecht's re-ran the check using her 8-digit driver's license number, and, five minutes after the initial decline recommendation,

---

change was made systemically in February 2002, the State did not issue new licenses simultaneously. Instead, as individuals renewed their licenses, they were issued the new license number beginning with "0." In September 2004, when Holmes renewed her license, her number was changed from 8 digits to 9 digits.

[7]The check was actually declined twice because the cashier ran the check two times.

[8]The check was actually declined six times because the cashier ran the check multiple times.

[9]The cashier ran the check two times and received two declines before running the check using the 8-digit license number.

TeleCheck issued a "Code 1." Hecht's accepted her check and Holmes was thus able to purchase the goods with a personal check.

**III.** ***Motions Related to Admissibility of Summary Judgment Evidence***

    **A.** ***Renewed Motion to Strike and/or Exclude Third Party Checkwriter Affidavits (Docket No. 342)***

TeleCheck asks the Court to strike and/or exclude the third party checkwriter affidavits filed by Holmes in support of her motion for summary judgment. TeleCheck contends that the affidavits are irrelevant and immaterial. TeleCheck further contends that permitting Holmes to inject into this case the unrelated allegations of third parties would prejudice TeleCheck by forcing it to defend entirely new matters that have no connection to the specific facts and circumstances of this case.

Plaintiff contends the affidavits constitute admissible and relevant evidence showing that TeleCheck engaged in a deliberate pattern and practice of refusing to provide consumers with information requested under 15 U.S.C. § 1681g in willful violation of the FCRA.

The Court will deny Defendants' motion to strike as moot because the Court did not rely on the third party check writer affidavits in resolving the parties' pending cross-motions for summary judgment. The Court will take up the issue of admissibility of these affidavits, if necessary, at trial.

    **B.** ***Renewed Motion to Strike and/or Exclude Documents from the Houston Better Business Bureau (Docket No. 343)***

TeleCheck asks the Court to strike and/or exclude the documents from the Houston Better Business Bureau ("BBB") filed by Plaintiff in support of her summary judgment motion.

9

TeleCheck contends that these documents are inadmissible and irrelevant. Plaintiff disagrees. She seeks to introduce two types of BBB documents: documents sent by TeleCheck to the Houston BBB and records maintained by the Houston BBB regarding similar experiences by other check writers who had checks declined by TeleCheck and were equally frustrated in their ability to obtain any information from TeleCheck. Plaintiff contends that all of these documents are relevant to the issue of whether Defendants willfully or negligently violated the FCRA as well as to prove other parts of Plaintiff's claims.

As to the BBB records consisting of complaints filed by other check writers, the Court will deny Defendants' motion to strike as moot because the Court did not rely on this evidence in resolving the parties' pending cross-motions for summary judgment. The Court will take up the issue of admissibility of these records, if necessary, at trial.

As to the documents sent *by* TeleCheck to the Houston BBB, the Court denies Defendants' motion. These documents are relevant to support Plaintiff's theory that Defendant TeleCheck International, Inc. is a "consumer reporting agency." The relevance and admissibility of these documents at trial for other purposes will be addressed, if necessary, by the Court at trial. ***C.*** ***Renewed Motion to Strike and/or Exclude Plaintiff's Supplemental Affidavit and Second Supplemental Affidavit (Docket No. 344)***

TeleCheck asks the Court to strike and/or exclude Plaintiff's Supplemental Affidavit and Second Supplemental Affidavit in which Plaintiff identifies certain alleged inaccuracies in TeleCheck's raw transaction data. TeleCheck argues that the affidavits contradict Holmes' sworn deposition testimony and that the alleged inaccuracies are irrelevant because Holmes has

adduced no evidence that TeleCheck published any of the allegedly inaccurate raw data to any third party.

Holmes argues that the challenged affidavits do not contradict her previous testimony. To the extent they do, Defendants may certainly address any contradictions in Holmes' testimony when cross-examining Holmes at trial.

Defendants could have taken a supplemental deposition of Holmes and fully explored the contents of the supplemental affidavits if they had such serious misgivings about her testimony. Yet, during the almost nine months between Plaintiff's filing of the affidavits and the date to which discovery was extended, Defendants chose not to depose Holmes regarding her supplemental affidavits, even when Holmes' attorney specifically offered to make her available.

In addition, the Court finds that the evidence adduced by Plaintiff regarding the alleged inaccuracies of raw transaction data is relevant to the issue of whether TeleCheck followed reasonable procedures to ensure maximum accuracy of the information concerning Holmes. Plaintiff alleges that this information, contained in "consumer reports" created and maintained by TeleCheck, formed the basis for TeleCheck's issuance of numeric codes to merchants each time

Holmes presented a check as a source of payment to a merchant. Thus, the motion will be denied.

### D.   Renewed Motion to Strike and/or Exclude the Affidavit of Julia Trotman (Docket No. 345)

TeleCheck asks the Court to strike and/or exclude the Affidavit of Julia Trotman filed by Holmes in opposition to TeleCheck's motion for summary judgment. Julia Trotman is Holmes'

massage therapist. She began providing massage therapy services to Holmes in early 2005, before Holmes filed this lawsuit. TeleCheck argues that Holmes timely failed to identify Trotman as an expert witness, that Ms. Trotman is not qualified to provide expert testimony, and that her affidavit contains inadmissible hearsay.

Trotman need not testify as an expert. Under Federal Rule of Evidence 701, she can testify as to her lay witness observations about Holmes' stress, pain, and conduct. As such, Defendants' motion to strike and/or exclude will be denied. Any further rulings with regard to the nature and extent of Trotman's trial testimony will be addressed, if necessary, by the Court at trial.

### E.     Renewed Motion to Strike and/or Exclude Expert's Supplemental Report (Docket No. 346)

TeleCheck asks the Court to strike and/or exclude Evan Hendricks' supplemental expert report (Docket No. 89, Exh. B) filed by plaintiff in support of her motion for summary judgment. Hendricks is the editor/publisher of a specialty news reporting service that covers credit reporting, fair information practices, and related matters. TeleCheck contends that Plaintiff filed Hendricks' supplemental report in an untimely manner and that the report addresses documents and testimony available to Hendricks before the disclosure deadline.

The Court finds that even if Hendricks' supplemental report contains "new" opinions, Plaintiff's failure to disclose this information until December 18, 2006, was harmless. While Defendants allege that consideration of Hendricks' report will "significantly prejudice TeleCheck," (Docket No. 346 at 2), Defendants do not explain how they will be prejudiced other than suggesting that Plaintiff was attempting to shield Hendricks' opinions from cross-

examination.  (*Id.* at 3 n.1).  However, over eleven months have passed since Plaintiff provided

the supplemental report to Defendants, and Defendants have not sought permission by the Court

to take a supplemental deposition of Hendricks.   Therefore, Defendants' motion to strike and/or

exclude the supplemental report will be denied.  Any further rulings with regard to the nature

and extent of Hendricks' trial testimony will be addressed, if necessary, by the Court at trial.

## IV.     *Cross-Motions for Summary Judgment*

### A.     *Standard of Review*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may

be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c).

In order to prevail, the movant has the burden of proving the absence of a genuine issue

of material fact as to an essential element of the opposing party's claim.  Celotex Corp. v. Catrett,

477 U.S. 317, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  In determining whether the

movant has met its burden, the Court must view the evidence in the light most favorable to the

nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct.

1348, 1356, 89 L.Ed.2d 538 (1986).

In order to defeat the motion, the nonmoving party is required to show, after an

adequate time for discovery, that there is a genuine issue of fact as to every essential element of

that party's case upon which he will bear the burden of proof at trial.  Celotex Corp., 106 S. Ct. at

2553.  In order to create a genuine factual issue, the nonmoving party must show "there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."

13

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Although the nonmovant need not show that the disputed issue should be resolved in his favor, he must demonstrate that there are genuine factual issues that "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id.

A preponderance of the evidence standard is used in this determination. Id. Therefore, if the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," the motion for summary judgment may be granted. Id. See also Matsushita Electric, 106 S. Ct. at 1356.

### B. Analysis

The FCRA was enacted in 1970 "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of America v. Burr*, 127 S. Ct. 2201, 2205-06 (2007)(citations omitted). More specifically, Congress enacted the FCRA "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. . . ." 15 U.S.C. § 1681(b). The Court should liberally construe the FCRA in favor of the consumer. *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 964 (6th Cir. 1998).

Plaintiff Holmes alleges that TeleCheck violated the FCRA in a number of ways. The Court will address each claim below. The issues of causation and damages with respect to Plaintiff's FCRA claims will be addressed collectively at the conclusion of this section.

### 1. "Inaccuracy of Information/Reasonable Procedures" Claims

14

Subparts 3-8 of Holmes' FCRA claim are based on allegations of inaccuracy of information provided to merchants. Holmes brings these claims under 15 U.S.C. § 1681e(b), which requires consumer reporting agencies to "follow reasonable procedures to assure maximum possible accuracy" when preparing a "consumer report".

To establish a prima facie case of inaccuracy under 15 U.S.C. § 1681e(b), a plaintiff must prove: "(1) the defendant reported inaccurate information about the plaintiff; (2) the defendant either negligently or willfully failed to follow reasonable procedures to assure maximum possible accuracy of the information about the plaintiff; (3) the plaintiff was injured; and (4) the defendant's conduct was the proximate cause of the plaintiff's injury." *Nelski v. Trans Union, LLC*, 86 Fed. Appx. 840, 844 (6th Cir. 2004); *see also Spence v. TRW, Inc.*, 92 F.3d 380, 382 (6th Cir. 1996)("[The Plaintiff] could not prevail on the claims asserted [regarding accuracy] without proving that the information in question was inaccurate . . . .")(citations omitted).

TeleCheck contends this claim fails as a matter of law because (1) the recommendations about which Holmes complains were not "consumer reports," and thus are not actionable under the FCRA; (2) even if they were "consumer reports," those recommendations did not disclose any inaccurate information about Holmes; and (3) in any event, TeleCheck's reporting procedures were reasonable.

### a.    TeleCheck is a "consumer reporting agency" under the FCRA.

The FCRA defines a "consumer reporting agency" as "any person which, for monetary fees, regularly engages in the practice of assembling or evaluating consumer credit information or other information on consumers for the purposes of furnishing "consumer reports" to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing

15

or furnishing consumer reports."   15 U.S.C. § 1681a(f).  TeleCheck represents itself as a "consumer reporting agency" on its public website ("TeleCheck is also a consumer reporting agency as defined in the Fair Credit Reporting Act") (Docket No. 157, Plf.'s App., Tab 23, website excerpts, pp. 5-7), in its training materials ("Under the FCRA guidelines, TeleCheck is a 'consumer reporting agency' because we render 'consumer reports.'")(Docket No. 157, Plf.'s App. Tab 2, TeleCheck training documents, TC000276 & TC000288), in its merchant contracts (Hecht's Contract, Plf.'s App. Tab 2, TC 002795-2805 ¶ 7), and in the "courtesy cards" provided by TeleCheck to merchants to give to consumers following a decline, which advise that consumers have a right to a "free copy of the information held in TeleCheck's files for a period of 60 days following an adverse action" and that "[c]onsumers also may dispute the accuracy or completeness of any information in *TeleCheck's consumer report*."  (Plf.'s App., Tab 25)(emphasis added).   TeleCheck's parent corporation, First Data, also indicates in its SEC filings that TeleCheck is subject to the FCRA "based on TeleCheck's maintenance of a database containing the check-writing histories of consumers and the use of that information in connection with its check verification and guarantee services."  (Plf.'s App., Tab 3).  The Court finds that, under these facts, TeleCheck is a "consumer reporting agency" under the FCRA.

### b.    The numeric codes issued to merchants by TeleCheck constitute "consumer reports" under the FCRA.

A "consumer report" is defined under the FCRA as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness,  credit standing, credit capacity, character, general reputation, personal

Case 3:05-cv-00633   Document 372   Filed 01/10/08   Page 16 of 52 PageID #: 8875

characteristics, or mode of living . . . ."  15 U.S.C. § 1681a(d)(1).  Further, the information must

be "used or collected in whole or in part for the purpose of serving as a factor in establishing the

consumer's eligibility for credit or insurance, employment purposes or any other purpose

authorized under 15 U.S.C. § 1681b."  *Id.*   Under § 1681b(a)(3)(F)(i), a "consumer report" may

be furnished to a person having "a legitimate business need for the information in connection

with a business transaction that is initiated by the consumer."

Defendants argue that the "Code 0" and "Code 3s" disclosed no information about

Holmes to merchants bearing on any of the seven characteristics set forth in the FCRA definition

of "consumer report," and thus, the FCRA does not apply.   Defendants' argument rests on the

fact that when TeleCheck issues a "Code 3" to a merchant, it provides the merchant with the

following description of the code: "TeleCheck has no negative information on the checkwriter or

company, but the check falls outside the guidelines that TeleCheck will guarantee at this time."

(Hogan Decl., Exh. A, TC002895).

The Court is not persuaded by Defendants' argument.   A "Code 3" transmittal must be

considered alongside all of TeleCheck's representations about its services to merchants.

TeleCheck represents that it can predict bad or risky check writers from good ones and that it

"contracts with merchants to provide those services (check verification or check guarantee) to

assist them in decreasing their risk of bad or fraudulent checks"  (Docket No. 331 at 2).

TeleCheck also states that it "uses the information in its database to determine whether or not a

consumer is 'worthy' of writing a check or opening a checking account.  TeleCheck's

communication of the response codes to the subscriber bears on the consumer's ability to write a

check or open a checking account."  (Docket No. 157, Plf.'s App., Tab 2, TC 000276-77 and

TC000288-89).   Thus, when TeleCheck issues a "Code 3" related to a check presented to a merchant, TeleCheck's code communicates a message about an identifiable person's "character, general reputation, personal characteristics, or mode of living," i.e., it is advising the merchant that the checkwriter standing before it poses some kind of risk.   TeleCheck is providing this information to a merchant who has a legitimate business need in connection with a business transaction initiated by the consumer, i.e., sales transactions initiated by Holmes at the merchants' stores.

    In addition, TeleCheck admits it issues "consumer reports."   In documents describing "Code 1," "Code 3," and "Code 4," TeleCheck states that "TeleCheck electronically or verbally communicates these *consumer reports* to its subscribers through the issuance of authorization response codes relating to the consumer's transaction with the subscriber."  (Plf.'s App., Tab 2, TC000276-77 & TC000288-89)(emphasis added).  The "courtesy cards" provided by TeleCheck to merchants to give to consumers following a decline advise that consumers have a right to a "free copy of the information held in TeleCheck's files for a period of 60 days following an adverse action" and that "[c]onsumers also may dispute the accuracy or completeness of any information *in TeleCheck's consumer report*."  (Plf.'s App., Tab 25)(emphasis added).

    Courts have held that check verification and guarantee companies are consumer reporting agencies and provide "consumer reports."  *See Estiverne v. Sak's Fifth Ave*., 9 F.3d 1171, 1173-74 (5th Cir. 1993)(holding that a check approval company's report was "consumer report" for FCRA purposes and store's obtaining of report for purpose of deciding whether to accept check was legitimate business need); *Greenway v. Info. Dynamics, Ltd.*, 524 F.2d 1145, 1146 (9th Cir. 1975)(holding that a report of the previous issuance of an unpayable check is a "consumer

18

report," subjecting issuer to requirements of the FCRA as a "consumer reporting agency," inasmuch as report bears on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, and personal characteristics, and check itself is, essentially, an instrument of credit); *Lofton-Taylor v. Verizon Wireless*, 2006 WL 3333759, at *3 (S.D. Ala. Nov. 14, 2006)(holding that a "report from a check approval company is a consumer report under § 1681a(d)."); *Alexander v. Moore & Assocs., Inc*., 553 F. Supp. 948, 950-51 (D.C. Hawaii 1983)(holding that a check guarantee service which gave to tenants a "Code 4" which caused them to later have their checks refused by various merchants issued "consumer reports" and thus was a "credit reporting agency" within the FCRA); *Peasley v. TeleCheck of Kansas*, 637 P.2d 437, 442 (Kan. App. 1981)(holding that "the check guarantee and reporting service on bank checks of consumers, which defendant engages in for the benefit of merchant subscribers, falls within the definition of a 'consumer report'" and "defendant in furnishing such service is a 'consumer reporting agency'").   Likewise, the Court finds that the numeric codes issued by TeleCheck to the merchants at issue constituted "consumer reports" under the FCRA.

> c.    **A genuine issue of material fact exists as to whether the "Code 3s" issued by TeleCheck transmitted inaccurate information regarding Holmes' 2005 checks, but not her 2003 and 2004 checks.**

Defendants maintain that even so, neither the "Code 3" nor the "Code 1" transmitted to merchants disclosed inaccurate information about Holmes.         In this Circuit, if the information actually conveyed to a third party is "technically accurate," the analysis ends there. *Dickens v. Trans Union*, 18 Fed. Appx. 315, 318 (6th Cir. 2001) ; *Garrett v. Trans Union, LLC*, 2006 WL 2850499, at *10 (S.D. Ohio Sept. 29, 2006); *Slice v. Choicedata Consumer Servs. Inc.*,

19

2006 WL 686886, at *7 (E.D. Tenn. Mar. 16, 2006)(finding no liability under § 1681e because the information communicated was accurate). Under the "technical accuracy" standard adopted by the Sixth Circuit, a "credit reporting agency satisfies its duty under section 607(b) if it produces a report that contains factually correct information about a consumer that might nonetheless be misleading or incomplete in some respect." *Dickens*, 18 Fed. Appx. at 318 (quoting *Cahlin*, 936 F.2d at 1156); *Garrett*, 2006 WL 2850499, at *9 (holding that a report entry that could have been more accurate and specific was still technically accurate and did not give rise to a FCRA claim).

As to the 2003 and 2004 checks at issue, the information conveyed by TeleCheck to Hecht's and Borders via its numeric codes was accurate. *See Johnson v. Equifax, Inc*., 510 F. Supp.2d 638, 646 (S.D. Ala. 2007)("Even if Johnson could establish that a Trans Union report was furnished to a third party, Trans Union's reporting of the MBNA account with the "included in bankruptcy" comment was accurate . . . . Consequently, Johnson's claim is without merit.") Regarding the August 22, 2003 check to Hecht's, the risk model considered such factors as Holmes' recent heavy volume of checks, her previous bounced check, and the amount of her check compared to the store average. Holmes provides no evidence that the application of those variables was inaccurate; she concedes that she had bounced a check a few months earlier, that she had written numerous checks recently, and that the check was for over $489.

According to Ahles, director of risk technology at TeleCheck, the August 26, 2003 check to Borders received a "Code 3" because Holmes did not obtain an overturn of the August 22 Hecht's "Code 3." Holmes does not dispute that the Hecht's "Code 3" occurred just four days

before the Borders transaction and concedes that she did not attempt to have TeleCheck overturn the Hecht's "Code 3" by calling TeleCheck on August 22, 2003.

As to the 2004 check to Hecht's, TeleCheck claims that Holmes received a "Code 0" response because she had already written a large check to Hecht's within the preceding 24 hours. Holmes does not dispute that she had written such a check. Holmes makes no argument, nor is there any evidence, that the TeleCheck system actually recommended approval of these check transactions or that the transactions actually passed the guidelines for the particular merchant's risk models.

However, as to the 2005 "Code 3" declines, the information about Holmes conveyed by TeleCheck to the merchants was neither accurate nor based on accurate information. Ahles testified that TeleCheck issued the "Code 3s" because its system failed to recognize Holmes' new driver's license number and therefore viewed her as a first-time check writer. [10] (Docket No. 157, Tab 30, Ahles Dep., Vol. 1, pp. 230-31). Holmes was certainly not a first-time check writer. She had years of check writing history in TeleCheck's system. However, TeleCheck's system and/or personnel failed to connect or associate her prior check writing history under her 8-digit driver's license number with her new 9-digit driver's license number. The parties dispute whether, and to what extent, TeleCheck modified its system to combine a check writer's history with her new one. [11] Considering that the heart of TeleCheck's system is the consumer's

_____

[10]Initially, TeleCheck blamed the merchants for Holmes' 2005 "Code 3" declines, claiming a "keying error" had occurred when merchants incorrectly added a "0" at the beginning of Holmes' driver's license number. (Docket No. 157, Plf.'s App., Tab 11, Defs.' Resp. to Plf.'s Interrogatories No. 1). This contention was apparently abandoned in October 2006.

[11]For example, director of TeleCheck risk technology Ahles testified that TeleCheck implemented a migration procedure to address the new Tennessee license numbers at some point in 2005 to correct this issue on an individual basis. Vice president of TeleCheck operations

transactional history,[12] a genuine issue of material fact exists as to whether TeleCheck followed reasonable procedures to assure maximum possible accuracy when it reported to merchants in 2005 that Holmes' checks could not be guaranteed--reports based, at least in part, on the inaccurate fact that Holmes was a first-time checkwriter.

**d.    A genuine issue of material fact exists as to whether TeleCheck's procedures in preparing "consumer reports" were unreasonable and in violation of the FCRA.**

Defendants argue that even if the "Code 0" and "Code 3s" were "consumer reports," and even if those codes disclosed inaccurate factual information about Holmes to merchants, Holmes has failed to offer any proof that TeleCheck's procedures in preparing the reports were unreasonable. In the Sixth Circuit, "the standard of conduct by which the trier of fact must judge the adequacy of [consumer reporting] agency procedures is what a reasonably prudent person would do under the circumstances." *Bryant v. TRW, Inc.*, 689 F.2d 72, 78 (6th Cir. 1982). The question of whether an agency followed "reasonable procedures' is typically a fact question reserved for the jury. *Boris v. Choicepoint Servs., Inc.*, 249 F. Supp.2d 851, 856 (W.D. Ky. 2003)(citations omitted).

TeleCheck uses two primary identifiers in the processing of paper check transactions-- driver's license numbers and bank account numbers. Merchants are not required to input both

_____

David Hogan testified, however, that employees in the call center did not have the ability to update a consumer's file if a "0" had been added to his or her license.

    [12]A first time check writer is assigned a "Risk PNC" (positive-negative count) score of "30," which improves over time as more checks are written and accepted in TeleCheck's system. The Risk PNC score is used along with other variables in the TeleCheck decision-making process. Check approvals and declines are based on scoring, which are affected negatively by "Code 3" declines and positively by "Code 1" acceptances. Thus, each and every check transaction that is processed through Defendants' system has some impact on the scoring of future transactions.

identifiers in the processing of a particular check. If a merchant inputs only one identifier (such as driver's license number only), the "consumer report" given to the merchants is limited to the information that is stored by TeleCheck based solely on the driver's license number. Similarly, if a merchant inputs only the bank account number, the information provided that forms the basis of the "consumer report" is limited as well. Holmes contends this is just one of the many ways in which the "consumer report" given by TeleCheck to merchants is inaccurate. By segregating the data regarding a particular consumer based on a driver's license or bank account number, TeleCheck self-limits the information provided. In other words, Plaintiff contends, a merchant is naturally given an incomplete consumer check writing history based on TeleCheck's decision to segregate its data.

The Court finds that whether TeleCheck used "reasonable procedures" in reporting information about Holmes to merchants and in maintaining reports on Holmes is therefore a question for the jury to determine.

For these reasons, Defendants' motion for summary judgment as to subparts 3 through 8 of Holmes' FCRA claim will be granted as to the checks written in 2003 and 2004 and denied as to the checks written in 2005.

### 2. **"File Disclosure" Claims**

Subparts 1 and 2 of Holmes' FCRA claim are based on TeleCheck's alleged failures to provide a complete or partial file disclosure, as well as a copy of the report forming the basis for denying her checks, to Holmes. TeleCheck maintains that it complied with the letter and the spirit of the FCRA in responding to Holmes' requests.

### a. **Refusal to provide file disclosures**

23

First, Holmes contends that until the filing of this lawsuit, TeleCheck refused to provide any type of file disclosure whatsoever. In addition, Holmes contends that even after the filing of this lawsuit, TeleCheck refused to provide a complete file disclosure compliant with the FCRA. Under 15 U.S.C. § 1681g(a), a consumer reporting agency shall, upon request, clearly and accurately disclose to the consumer:

> (1)     all the information in the consumer's file at the time of the request;
> (2)     the sources of the information;
> (3)     identification of each person that procured a consumer report during a period of one year preceding the date on which the request is made;
> (4)      the dates, original payees, and amounts of any checks upon which is based any adverse characterization of the consumer included in the file at the time of the disclosure;
> * * * *
> (6)     If the consumer requests the credit file and not the credit score, a statement that the consumer may request and obtain a credit score.

Under § 1681a(g), the term "file" when "used in connection with information on any consumer, means all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored."

Before making a "file disclosure," consumer reporting agencies "shall require, as a condition of making the disclosures required under [15 U.S.C. §1681g, the file-disclosure provision], that the consumer furnish proper identification." 15 U.S.C. §§ 1681h(a)(1) and 1681g(a). TeleCheck contends that it provided a file disclosure once Holmes submitted the proper identification in connection with her request for that disclosure.

Holmes claims that she made an oral request by telephone to "Rita" at TeleCheck for a complete file disclosure on August 26, 2003, and that "Rita" advised her to submit a written file

request, which she did not do.  TeleCheck has no record of Holmes' alleged oral request.  At that time, Federal Trade Commission ("FTC") commentary stated that an agency may insist on a written request for a file disclosure.  *See* 16 C.F.R. Part 600, § 609, Part 3.  The FCRA did not require TeleCheck to make file disclosures upon telephonic request until after the 2003 FACT Act Amendments became effective in December 2004.  *See* 16 CFR § 610.3 (effective date of Dec. 1, 2004).   However, the FTC commentary was not binding; the statute simply stated that "upon request" the consumer reporting agency "shall" produce the file. TeleCheck has not refuted Holmes' assertion that she spoke with "Rita" at TeleCheck and requested her file.  A genuine issue of material fact exists as whether Holmes made a request for a file disclosure to TeleCheck via "Rita" in 2003.

Holmes sent letters dated September 11, 2003, and October 2, 2003, requesting a "detailed written explanation stating the reason(s) for declining to approve [her] checks." (Docket No. 157, Plf.'s App., Tabs 5 & 6).  According to TeleCheck, Holmes' letters simply questioned why her checks were declined and because they did not request file disclosures specifically, TeleCheck did not disclose her file. Instead, TeleCheck sent a form letter dated October 2, 2003, requesting that Holmes provide her driver's license number, all the numbers at the bottom of the check from the left to the right and her Social Security number.  TeleCheck indicated that the information was being requested "for the sole purpose of locating" Holmes' file and/or information pertaining to Holmes' inquiry. (Plf.'s App., Tab 6).

Holmes sent another letter to TeleCheck dated October 15, 2003, again asking TeleCheck to explain why her check was denied.  (Plf.'s App., Tab 6).  TeleCheck sent a letter to Holmes

dated November 4, 2003, stating that Holmes' file reflected a "positive status" and contained "no derogatory information."  (Plf.'s App., Tab 7).

Holmes' third letter, sent November 11, 2003 (incorrectly dated September 11, 2003), stated: "Please state in full and complete detail, [sic] all facts, information and data which TeleCheck relied upon and/or utilized in concluding that 'the check simply did not meet the acceptance guidelines that TeleCheck has established.'"  (Docket No. 85, Tab 8)(emphasis in original).  Holmes further insisted on "an immediate, complete, specific and accurate response to [her] inquiries and full disclosure stating the specific grounds behind the denial of [her] checks and also information on what [she] c[ould] do in the future to avoid these humiliating experiences."

TeleCheck contends it sent a letter to Holmes in response dated December 11, 2003, but it has not produced the letter.  The parties dispute whether Defendants purposefully destroyed or inadvertently lost or destroyed the letter.  Holmes recalls receiving a letter stating that TeleCheck had made an adjustment to her account and that the specific type of adjustment was not explained.  (Plf.'s App., Tab 21, Holmes Aff. ¶ 8).

Holmes wrote TeleCheck again on August 24, 2004, regarding her file and enclosed all prior communications between the parties.   TeleCheck responded by letter saying that Holmes' "file reflects a positive status and contains no derogatory information."  (Plf.'s App., Tab 11).

The court finds that a genuine issue of material fact exists as to whether Holmes' 2003 and 2004 letters contained requests for file disclosures under the FCRA, triggering TeleCheck's obligation under § 1681g(a) to disclose Holmes' files.

Holmes' husband/attorney sent a letter to TeleCheck dated September 17, 2004. In the letter, he referenced Holmes' November 4, 2003 letter, and requested that TeleCheck "state in full and complete detail, all facts, information, and data which TeleCheck relied upon and/or utilized in concluding that 'the check did not meet the acceptance guidelines that TeleCheck had established.'" (Plf.'s App., Tab 12). The letter further requested that TeleCheck "forward a complete copy of Ms. Holmes' file." (*Id.*) TeleCheck advised Mr. Holmes that it could not locate the checkwriter information without Mrs. Holmes' unique identifiers.[13]

Mr. Holmes sent another letter, dated October 29, 2004, demanding that TeleCheck "provide a detailed, written response to Ms. Holmes' inquiry related to the checks referenced in counsel's September 17, 2004, letter" and also to "forward a complete copy of Ms. Holmes' file." (Plf.'s App., Tab 14). Because he still did not provide Holmes' unique identifiers, TeleCheck again advised Mr. Holmes that such information was required before TeleCheck could provide information to him.

Mrs. Holmes sent a letter to TeleCheck, dated May 22, 2005, in which she provided "written notification that [she] would like to receive a free copy of the consumer's information held in TeleCheck's file with regard to [her] account." (Plf.'s App., Tab 16). The parties agree that this letter clearly contained a request for a file disclosure. However, TeleCheck did not release a file disclosure. TeleCheck maintains that it did not provide a file disclosure because Holmes provided an identifier (her expired 8-digit license number) that did not match the one

---

[13]TeleCheck also contends that Ms. Holmes did not provide her proper authorization for the release of information to Mr. Holmes and did not notify TeleCheck that he was acting as her attorney. However, his September 17, 2004 letter to TeleCheck states that "Ms. Holmes has retained our firm to represent her related to problems she has encountered with TeleCheck." (Plf.'s App., Tab 12).

(her 9-digit license number) used in the Arden B. transaction about which she was inquiring. Holmes, on the other hand, contends that her check was ultimately accepted by TeleCheck at Arden B. using the 8-digit license number.

Instead of providing a file disclosure, TeleCheck sent to Holmes two letters dated June 3, 2005, stating that the unique identifier she had provided to TeleCheck reflected no negative history. TeleCheck provided a toll-free number for Holmes to call. She did not call that number to discuss her request.

At a minimum, Holmes urges, TeleCheck should have informed Holmes that there was some confusion as to her eight and nine digit driver's license numbers. TeleCheck maintains that because of the conflicting information provided by Holmes, it did not have confidence in her identity.

Holmes sent another letter dated June 14, 2005, stating that "once again, I am requesting that you send me a free copy of the consumer's information held in TeleCheck's file with regard to me." (Plf.'s App., Tab 18). According to TeleCheck, Holmes did not provide the identifier used in the transaction about which she was inquiring, nor did she provide any identifiers. Instead, Holmes provided a reference number associated with the specific transaction about which she inquired, so TeleCheck responded to her inquiry about that transaction but, without a unique identifier from Holmes in her June 14 letter, did not provide a file disclosure.

Holmes requested a file disclosure again on August 8, 2005, in her letter to TeleCheck inquiring about the July 14 declines at Charlotte Russe and Hecht's. In her written correspondence to TeleCheck, she provided two different bank account numbers, one of which she admits was incorrect with regard to the Hecht's transaction at issue.

TeleCheck maintains that it responded by telling her that an "adjustment" had been made to her file and by providing Holmes with a file disclosure for the valid bank account number she provided in August 8, 2005 letter.

On or about October 11, 2005 -- after Holmes had filed this lawsuit -- a document entitled "TeleCheck File Repo" was mailed to Holmes, without a cover letter or a "Summary of Rights." TeleCheck maintains that it provided this document to Plaintiff as a file disclosure in response to her August 8, 2005 letter. Plaintiff has adduced evidence that the "TeleCheck File Repo" was generated per the instructions of Jane Williams, in-house counsel for TeleCheck, as confirmed in her September 29, 2005 email to Plaintiff's counsel after the filing of this lawsuit. (Plf.'s App., Tab 32). The Court finds that there is a genuine issue of material fact as to whether TeleCheck provided a file disclosure in response to Plaintiff's August 8, 2005 request.

Plaintiff contends that at no time did TeleCheck tell Holmes to put each and every identifier on each and every communication. Their standard practice is to send the "insufficient information" form letter, similar to the one that was mailed to Holmes four times. Thus, contends Plaintiff, the whole purpose of the TeleCheck process--coupled with not cataloging prior communications--is designed to give consumers the runaround.

TeleCheck does not tell consumers that the information disclosed will be limited to the identifiers provided. Plaintiff contends that TeleCheck should provide all information based on the identifiers provided by the consumer as well as identifiers known by TeleCheck to be associated with that particular person.

The Court finds that a genuine issue of material fact exists as to whether TeleCheck's conduct in response to Mr. and Mrs. Holmes' oral and written communications complied with § 1681g(a) of the FCRA.

The Court also finds that a genuine issue of material fact exists as to whether TeleCheck ever provided Holmes with a *complete* file disclosure upon Holmes' request. The term "file" is defined by 15 U.S.C. § 1681a(g) as "all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how that information is stored." Plaintiff contends that a complete file disclosure would be all information related to all checks on the consumer making the request in TeleCheck's system and that TeleCheck refused to produce her complete file.

Plaintiff alleges that the information contained in the "Repo" was incomplete and therefore inaccurate because: the information was limited to six check transactions processed through TeleCheck using only two identifiers: Holmes' AmSouth bank account and 9-digit Tennessee driver's license number; no information was provided about the Bank of America account that Holmes had used during 2003 and 2004, when she experienced problems with TeleCheck; nor was any information provided regarding the 8-digit Tennessee driver's license number; the "Repo" did not contain several checks Holmes had written to TeleCheck merchants during this time frame; the "Repo" did not contain Holmes' date of birth, although TeleCheck had this identifying information about her in its files and uses a consumer's age as a factor in processing check transactions; and there is no mention of the Swim 'N Sport Check, although Defendants claim that Holmes' check was declined on August 22, 2003, based on her prior check writing activity and the Swim 'N Sport check.

### b. Refusal to provide reasons forming the basis to deny Holmes' checks

Holmes alleges that TeleCheck failed "to provide a copy of a report forming the basis to deny Holmes' checks . . . ." (Compl. ¶ 40(1)). To the extent that this theory seeks a disclosure of Holmes' file, it is duplicative of Plaintiff's claim that TeleCheck violated § 1681g(a). To the extent that Holmes is seeking the reasons behind TeleCheck's issuance of "Code 3s" with regard to her checks, it is undisputed that she and her husband/attorney repeatedly requested the specific reasons for the codes issued to merchants.

According to TeleCheck, the reasons and bases for a "Code 3" decline necessarily involve the application of risk predictors to specific transactions. TeleCheck maintains that it does not disclose to check writers the variables used in the risk models for two practical reasons: (1) the scoring models are proprietary and (2) persons trying to present fraudulent checks could more easily circumvent TeleCheck's system for improper and unlawful purposes. TeleCheck provided to Plaintiff a general explanation of factors that could impact a risk decline recommendation.

The FCRA expressly excludes from the disclosure requirement "any information concerning credit scores or any other risk scores or predictors relating to the consumer." 15 U.S.C. § 1681g(a)(1)(B). In the 2003 FACT Act amendments to the FCRA, Congress added an exemption for check services companies from certain requirements to provide consumers with access to credit scoring information. *See* 15 U.S.C. § 1681c(d)(2). Therefore, as a matter of law, TeleCheck cannot be liable for failing to provide to Holmes the risk reasons for the "Code 3s," and Defendants' motion for summary judgment on this issue will be granted.

### c. Inaccuracy of report provided to Holmes

To the extent that Holmes claims that the accuracy requirement applies to file disclosures provided directly from a consumer reporting agency to a consumer, that claim also fails. The accuracy requirement for consumer reporting agencies relates to the preparation of "consumer reports," not to file disclosures. *See* 15 U.S.C. § 1681e(b). In other words, a claim for inaccuracies in a file disclosure is not cognizable under the FCRA.

For the reasons explained above in this section, Defendants' motion for summary judgment as to subparts 1 and 2 of Holmes' FCRA claim will be denied in part and granted in part.

### 3. "Reinvestigation" Claims

Subparts 3, 4, and 7 of Holmes' FCRA claim relate to the FCRA reinvestigation procedures under § 1681i. Section 1681i sets forth a separate procedure for disputing the accuracy of a file disclosure after that disclosure is provided to the consumer. Holmes alleges TeleCheck violated the FCRA by: (a) failing to give Holmes the opportunity to dispute the accuracy or completeness of TeleCheck's reports or files, or to request that any inaccurate or unverified information be removed from those files; and (b) failing to remove, correct, or modify those reports or files based on inaccurate or incomplete information.

Under 15 U.S.C. § 1681i, "if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period beginning on the date on

32

which the agency receives the notice of the dispute from the consumer or reseller." 15 U.S.C. § 1681i(a)(1)(A).

In *Spence v. TRW, Inc.*, 92 F.3d 380 (6th Cir. 1996), the court held that § 1681i "contemplates that the consumer will convey this information to the reporting agency so that the agency can record the current status of the information." *Id*. at 383. Because the plaintiff had not notified the defendant of the inaccuracy of a particular item of information listed on a report, his FCRA claim failed. *Id.* n.1 ("Mr. Spence did send TRW a communication . . . in which he demanded reinvestigation of 'any and all negative entries contained in [his] credit report.' This was simply not sufficient to put TRW on notice that the hospital item was obsolete.").

TeleCheck contends that Holmes likewise never notified TeleCheck that any specific information was inaccurate. Instead, TeleCheck urges, Holmes simply asked why four merchants declined her checks and argued that the checks should not have been denied. According to Plaintiff, however, after numerous adverse actions, she repeatedly disputed the completeness and/or accuracy of items contained in TeleCheck's system, specifically, any information in her file that was causing or contributing to a check decline. For example, Holmes claims that her August 2003 call to "Rita" initiated the reinvestigation process. TeleCheck argues that, even assuming the call to "Rita" occurred, Holmes was only "disputing TeleCheck's information;" thus, by failing to specify the specific information she disputed, she did not trigger the reinvestigation process under the FCRA.

Plaintiff contends that TeleCheck deliberately refused to reinvestigate and points to its policy of submitting only form letters to consumer inquiries and its failure to properly train its

33

employees to conduct a proper investigation.  The Court finds that a genuine issue of material fact exists as to whether TeleCheck violated § 1681i of the FCRA.

Following reinvestigation, if the disputed information is found to be inaccurate, incomplete, or unverifiable, a "consumer reporting agency" is required to promptly delete that information from the file or modify that information as appropriate based on the reinvestigation and promptly notify the furnisher that the information has been modified or deleted from the file of the consumer.  15 U.S.C. § 1681i(a)(5).

If any information has been removed or modified from the consumer's file based on the request for a reinvestigation, the CRA must provide a revised consumer disclosure to the consumer as a result of the reinvestigation.  15 U.S.C. § 1681i(a)(6)(B)(ii).   Holmes alleges that in December 2003, she received a letter stating an adjustment had been made to her file, but she was not told the nature of the adjustment nor did TeleCheck send an updated file disclosure.  She alleges that on August 18, 2005, she was told that an adjustment had been made, but she was not told the nature of the adjustment nor did she receive an updated file disclosure.  According to Plaintiff, the adjustments were all made in conjunction with disputes by Holmes either by phone or through letters, and neither Holmes nor the merchants were ever notified under 1681i.  There is a genuine issue of material fact as to whether TeleCheck violated §§ 1681i(a)(5) and (a)(6)(B)(ii) by its alleged conduct.

In sum, the Court finds that a genuine issue of material fact exists as to Plaintiffs' reinvestigation claim.  Thus, as to subparts 3, 4, and 7 of Holmes' FCRA claim, Defendants' motion for summary judgment will be denied.

### 4.      **"Inadequate Staffing and Training" Claims**

In subpart 9, Holmes claims TeleCheck violated 15 U.S.C. § 1681h(c) by failing "to provide adequate resources to comply with the FCRA, including, but not limited to, adequate staffing and training of personnel . . . ." (Compl., ¶ 40(9)).   The FCRA provides:  "Any consumer reporting agency shall provide trained personnel to explain to the consumer any information furnished to him pursuant to section 1681g of this title."  15 U.S.C. § 1681g(c).  "The burden is on the consumer to establish that a credit reporting agency's procedures for training or disclosure are deficient."  Guimond v. Credit Bureau Inc. of Georgia, 1992 WL 33144, at *3 (4th Cir. Feb. 25, 1992).

TeleCheck contends Holmes' inadequate staffing and training claim fails because at no time did Holmes seek from TeleCheck any explanation of her file disclosure.  TeleCheck points out that since 2004, it has maintained a 24-hour call center for check writers to request file disclosures and to ask questions about a file disclosure.  Holmes admits she spoke with a TeleCheck employee both times she called TeleCheck and that TeleCheck responded to all of Holmes' letters.

Holmes, however, has adduced evidence that TeleCheck is unable or unwilling to adequately respond to consumers' requests for information regarding their files and check declines.  For example, Holmes points to evidence that TeleCheck call center representatives are overworked and required to handle over 100 calls daily; as a result, consumers frequently back up in the "queue" and representatives  are pressured to shorten calls to eliminate the backlog. (Docket No. 85, Tab 36, Ramirez Dep. at pp. 12-13, 30).  Further, representatives hang up on consumers or transfer calls to another department, causing customers to "go around and around." (Id. at pp. 23-24).  In other instances, representatives are instructed to tell consumers that their

35

calls are being transferred to another representative, hold for one minute, then hang up. (*Id.*, TC000581). Representatives are not properly trained to investigate disputes or facilitate the access to a consumer's file. Instead, representatives are required to use scripts from which they cannot deviate. (*Id.* at pp. 39-40). Dissatisfied consumers asking for a supervisor are simply forwarded to a representative posing as a supervisor. (*Id.* at pp. 9-10). Representatives are instructed not to escalate calls to the Consumer Resolutions Department/Office of the President ("CRD/OOP"). According to Jerry Montiel, a CRD/OOP representative since 2000, a call is escalated to him only once every 1-6 months. (Docket No. 85, Tab 29, Montiel Dep. at pp. 16-17; Docket No. 85, Tab 28, TC00950).

As to written communication, Holmes has adduced evidence that CRD/OOP representatives are limited in their ability to respond to consumers and required to use forms or templates when responding to consumer letters. The form letters do not contain the name of the CRD/OOP employee responding to the letter, making follow up more difficult. (Montiel Dep. at pp. 17-18). Consumer letters are stored in a file cabinet by month and date only. The letters are then rotated by date and placed in boxes housed in a storeroom in the CRD/OOP. (*Id.* at pp. 25-26).

The Court finds that a genuine issue of material fact exists as to whether TeleCheck violated the FCRA by failing to provide adequate staffing and training of personnel.

### 5.    Improper Request of Information Claims

In subpart 10 of Holmes' FCRA claim, she alleges that TeleCheck violated "federal regulations" by improperly requesting her Social Security Number. (Compl., ¶ 40(1); Docket No. 83 at 24; Docket No. 100 at 345). Holmes claims that TeleCheck did not use her Social

Security number as an identifier when processing check transactions and thus should not have asked for that information.

The "federal regulation" upon which Holmes relies is an FTC interpretative rule: 16 C.F.R. § 610.2(a)(2)(ii). (*See* Docket No. 152 at 30). Even if FTC rules and regulations could give rise to a private cause of action,[14] the FTC rule on which Holmes relies did not exist until December 2004. *See* 16 C.F.R. § 610.3 (effective date of Dec. 1, 2004). TeleCheck's requests for Holmes' Social Security number occurred in 2003. (*See* Docket No. 114, Exhs. 20 & 23).

Furthermore, the FTC's commentary lists certain information that a "consumer reporting agency" may request from a consumer, including a Social Security number. *See* 16 C.F.R. § 614.1. In conjunction with the FACT Act Amendments to the FCRA, the FTC stated: "[I]t is reasonable for consumer reporting agencies to request the full Social Security number if they determine it to be necessary . . . . Furthermore, because names, addresses, and birth dates are not always unique to a consumer, full Social Security numbers may be necessary to ensure that consumer reporting agencies match the consumer with the correct file." 69 Fed. Reg. 63,922, 63, 931 (Nov. 3, 2004).

In any event, this claim must fail because Plaintiff waived her objection to TeleCheck's request for her Social Security number. Upon TeleCheck's request, Holmes provided her Social Security number to TeleCheck in writing without objection in October 2003. In 2005, she

---

[14]*See e.g., Wilson v. Prudential Fin.*, 475 F. Supp.2d 48, 52 (D.D.C. 2007)(holding that a private litigant can seek damages only for violations of the FCRA because "the only duties that may be actionable against [the agency] are those enumerated in the FCRA"); *Briggs v. Emporia State Bank & Trust Co.*, 2005 WL 2035038, at *4 (D. Kan. Aug. 23, 2005)(holding that an agency regulation "cannot conjure up a private right of action that has not been authorized by Congress").

provided it again without objection or apparent reservation to TeleCheck, without TeleCheck having specifically requested that information.

For these reasons, Plaintiff's claim fails and Defendants' motion for summary judgment as to this claim will be granted.

### 6. <u>Wrongful Dissemination of Information Claims</u>

In subpart 11 of her FCRA claim, Holmes contends that TeleCheck wrongfully disseminated "reports, file material and/or other information" about Holmes to "unauthorized and improper persons, parties or entities." (Compl. ¶ 40 (11)). Holmes bases this claim, in part, on the fact that TeleCheck could not locate four letters from Holmes in off-site storage during discovery.

TeleCheck contends that this is no way no demonstrates that TeleCheck wrongfully disseminated reports, file material and/or other information about Holmes. TeleCheck has adduced evidence that it keeps consumer letters in a locked room for one year and then houses those letters in a secure off-site storage facility for six additional years. (Moore Dep. at 140).

Holmes has not produced any evidence to support her contention that TeleCheck provided her information to any unauthorized party.

Holmes also bases this claim on the existence of a facsimile header printed on certain letters produced in discovery that reads: "7133328284 Innovis Marketing." (Docket No. 130, Exh. 1). The facsimile machine that produced that header was located in the TeleCheck Consumer Resolutions Department and had been in that location many years ago. (Clark Dep., Docket No. 133 at 127-28). The letters at issue were faxed from that machine to TeleCheck's server to generate electronic copies of the letters and were not disclosed to a third party. (*Id*. at

131).  Holmes has adduced no evidence that these letters were provided to an unauthorized third party.  Holmes' FCRA claim based on dissemination of information to unauthorized third parties thus fails as a matter of law.

### 7.     Failure to Include a "Summary of Rights" Claim

Holmes alleges that TeleCheck violated 15 U.S.C. § 1681g(c)(2) by failing to include a FCRA "Summary of Rights" with the October 5, 2005 "File Repo."   As Defendants point out, Holmes' Second Amended Complaint does not include a claim for failure to include a "Summary of Rights" with a file disclosure under § 1681g(c)(2).  (*See* Docket No. 59, ¶ 40).  Defendants are entitled to summary judgment on this claim.

### 8.     Causation

Defendants argue that they are entitled to summary judgment because Holmes failed to produce evidence that the alleged actions of Defendants caused her harm.  To prevail on a FCRA claim, a plaintiff must prove that the defendant's violation(s) of the Act caused her injury.  *Lewis v. Ohio Prof'l Elec. Network, LLC*, 248 F. Supp.2d 693, 701 (S.D. Ohio 2003)(citing *Crabill*, 259 F.3d at 664 ("Without a causal relation between the violation of the statute and the loss of credit, or some other harm, a plaintiff cannot obtain an award of 'actual damages,' which is one of the remedies under the FCRA.")).

Plaintiff contends that as a result of TeleCheck's violations of the FCRA, her checks were declined at the point of sale and she therefore suffered damage to her reputation, having been labeled a bad check writer and a risk.  She contends that the emotional distress she suffered was the direct result of the initial and subsequent declines of her checks at the recommendation of TeleCheck.   She also contends she suffered stress and mental anguish throughout the two

years prior to the filing of this lawsuit during which she repeatedly tried to obtain information

from TeleCheck.   The Court finds that Holmes withstands summary judgment on the issue of

causation.  *See Boris*, 249 F. Supp.2d 851, 860 ("Based on Plaintiff's testimony and the

additional evidence from two very credible witnesses, a jury could quite reasonably find that

[defendant's] actions caused the emotional distress which Plaintiff so vividly described.";

*Stevenson*, 987 F.2d at 297 (finding injury where plaintiff was denied credit three times and

experienced considerable embarrassment from having to discuss the problems with business

associates); *Pinner v. Schmidt*, 805 F.2d 1258, 1265 (5th Cir. 1986)(finding liability where

embarrassment and stress resulted from lengthy dealings with credit bureau).

**9.**    **Damages**

The FCRA provides for an award of actual damages to redress a violation of the statute.

15 U.S.C. § 1681o.  If a violation is negligent, the affected consumer is entitled to actual

damages. § 1681o(a).  If willful, however, the consumer may recover actual damages or statutory

damages ranging from $100 to $1,000, and even punitive damages. § 1681n(a).

Holmes seeks actual damages for emotional distress and humiliation stemming from

Defendants' "Code 3" and "Code 0" declines, alleged inaccurate reporting, and failure to provide

and correct information.

"It is well settled that actual damages under the FCRA are not limited to out-of-pocket

expenses and may instead include humiliation and mental distress."  *Boris*, 249 F. Supp.2d 851,

859 (citing the Fifth, Second, and Ninth Circuits).   Even where no pecuniary or out-of-pocket

loss has been shown, the FCRA permits recovery not only for humiliation and mental distress,

but for injury to one's reputation and creditworthiness.  *Boris*, 249 F. Supp.2d 851, 86-61 (citing

*Bryant*, 689 F.2d at 79)). However, there must be proof to support a finding of actual or compensatory damages. *Id.* at 861. "It is important to remember that damages for emotional distress and damages for [injury to] business reputation are based on entirely different evidentiary foundations. Plaintiff's credible testimony can support her own claim of emotional distress. However, damage to credit or business reputation must rest upon some extrinsic evidence, not just upon Plaintiff's opinion." *Id.*

Further, to recover for emotional distress, a plaintiff must explain the circumstances in reasonable detail. *Bach v. First Union Nat'l Bank*, 149 Fed. Appx. 354, 361 (6th Cir. 2005)(affirming an award of $400,000 in compensatory damages, finding the plaintiff produced "sufficient evidence of actual damages in the form of emotional pain and suffering, humiliation, lost of credit opportunities and damage to her reputation for creditworthiness" to support the jury finding). "An injured person's testimony alone may suffice to establish damages for emotional distress provided that she reasonably and sufficiently explains the circumstances surrounding the injury and does not rely on mere conclusory statements." *Id.* at 19; *see also Boris*, 249 F. Supp.2d 851, 859 & n.3 (finding that plaintiff's testimony and the testimony of her two co-workers as to plaintiff's humiliation, mental distress, and embarrassment "was sufficiently specific to constitute direct evidence of her emotional distress, rather than being merely conclusory statements or speculation about future distress" and rejecting defendant's argument that plaintiff failed to differentiate between the stress caused by the inaccurate credit report and other stress in her life because "Plaintiff and her co-workers were very believable witnesses who articulated a clear and credible picture of the emotional turmoil [Defendant] caused [and] [t]his [was] more than enough to support a claim for emotional distress.").

41

Holmes has testified that she suffered emotional distress, humiliation, sleepless nights, embarrassment, anxiety, and fear as a result of TeleCheck's alleged FCRA violations. She also testified that her back pain has been aggravated by stress she claims TeleCheck caused. Holmes also has produced the testimony of her daughter,[15] her massage therapist, and her neurologist to support her causation theory and damages claims.

Under *Bach*, the evidence adduced by Plaintiff is sufficient to create a genuine issue of material fact about whether Holmes suffered emotional and aggravated physical injuries because of TeleCheck's alleged FCRA violations. *See also Lewis*, 248 F. Supp.2d at 703; *Swanson v. Central Bank & Trust Co.*, 2005 WL 1324887, at *3 (E.D. Ky. June 3, 2005).

Holmes also seeks statutory and punitive damages. A plaintiff may recover statutory damages in lieu of actual damages only upon a showing of a willful FCRA violation. 15 U.S.C. § 1681n. The Supreme Court recently held, in *Safeco Ins. Co. of America v. Burr*, 127 S. Ct. 2201 (2007), that punitive and statutory damages may be recovered under the FCRA only if a plaintiff demonstrates: (1) the defendant knowingly violated her FCRA rights; or (2) the defendant acted with reckless disregard for those rights. *Id.* at 2208. The Court reiterated that a reckless action is one entailing an "unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 2215. "It is this high risk of harm, objectively assessed, that is the essence of recklessness at common law." *Id.* at 2214. As ultimately explained by the Court in *Safeco*, "a company subject to the FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that

---

[15]Defendants argue that Holmes' daughter offers testimony about two check transactions, one of which resulted in an approval minutes later. (Docket No. 331 at 30 & n.40). However, this argument speaks to the amount of damages available, not to whether Holmes has submitted corroborating evidence of her alleged emotional injury.

the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 2215.

TeleCheck first argues that Holmes' Complaint does not allege that TeleCheck willfully violated the FCRA and, for that reason alone, her demand for punitive or statutory damages should be dismissed. (*See* Docket No. 331 at 32 n.42). According to TeleCheck, Holmes did not allege that TeleCheck willfully violated the FCRA in the first three versions of her Complaint; even after she requested leave to amend her Complaint to add a willful claim months after the pleadings were closed, and the Court granted her leave to amend over TeleCheck's objections, Holmes never amended her Complaint to include allegations of a willful FCRA violation. (*Id.*)

In granting Holmes' motion to amend her complaint, the Magistrate Judge reasoned, "[a]lthough it might not have been clear before, once the plaintiff filed her amended complaint on May 1, 2006, seeking punitive damages, it should have been clear to the defendant that the plaintiff was asserting a claim for willful violation of the FCRA. As the plaintiff has pointed out, the only vehicle by which the plaintiff could be awarded punitive damages under the FCRA is for the defendant's willful noncompliance under 15 U.S.C. § 1681n, since punitive damages are not permitted for negligent noncompliance under 15 U.S.C. § 1681o." (Docket No. 191 at 3-4). The Magistrate Judge went on to say: "However, it is clear to the Court that the defendant was fully aware that the plaintiff was asserting claims for willful noncompliance even before May 1, 2006, when the defendant served the plaintiff with interrogatories, to which the plaintiff served responses on January 24, 2006." (*Id.* at 4). And, again, "The plaintiff has consistently argued

43

that her FCRA claim is grounded in both negligent and willful violations and the defendant has been fully aware of the plaintiff's assertions." (*Id.* at 6).

The docket in this case reflects that Plaintiff never filed the requested amendment. It is unknown to the Court why Holmes never amended her Complaint in the manner requested and allowed.[16] As evidenced by her court filings since that time, Plaintiff still seeks statutory and punitive damages for TeleCheck's alleged willful FCRA violations. (*See* Plf.'s Supp. Brief in Support of SJ Motion, Docket No. 349 at 30-35 describing "Defendants' Willful Violations of the FCRA" and 36-40 describing damages for "willful violations"). The Magistrate Judge believed that Holmes' proposed amendment was for clarification purposes only and that Holmes' Second Amended Complaint sufficiently alleged willful violations of the FCRA. That is the law of this case. The Complaint shall be construed to include claims for statutory and punitive damages, and the parties shall include such claims in their proposed Pretrial Order.

Alternatively, TeleCheck argues that this case does not involve a "knowing" violation of the FCRA. Nor, according to TeleCheck, do the facts of this case demonstrate the requisite "recklessness" under the *Safeco* two-prong test.

Plaintiff argues that TeleCheck willfully provided inaccurate "consumer reports" in violation of 15 U.S.C. § 1681e(b). Plaintiff contends that TeleChecks' "consumer reports" are inherently inaccurate because they are not based on the creditworthiness of the consumer or the risk associated with the check transaction, but on the profit and loss of TeleCheck. Plaintiff has

---

[16]Holmes had simply asked for permission to include the following sentences to Paragraph 40 of the Second Amended Complaint: "TeleCheck intentionally violated the Fair Credit Reporting Act. Alternatively, TeleCheck negligently violated the Fair Credit Reporting Act." (Docket No. 76).

Case 3:05-cv-00633   Document 372   Filed 01/10/08   Page 44 of 52 PageID #: 8903

presented her own testimony as well as the testimony of Kimberly Hughes, a risk analyst, to support her contention.

Plaintiff also argues that TeleCheck willfully violated 15 U.S.C. § 1681g. According to Plaintiff, implicit in complying with § 1681g would be the necessary infrastructure to adequately respond to consumers' requests for information. Instead, Plaintiff claims, TeleCheck has designed a system to confuse, frustrate, and discourage consumer inquiries and disputes. In support of this theory, Holmes has presented her own testimony, expert testimony of Hendricks, and testimony of TeleCheck employees Ramirez, Montiel, Cox, and Moore. She has also presented written correspondence from TeleCheck, internal TeleCheck documents, and documents generated to and by the Houston BBB.

In further support of her willfulness argument, Plaintiff maintains that her situation is not an anomaly, but an example of a widespread practice by TeleCheck throughout the country. She submits the affidavit testimony of Stacy Fletcher, the director of dispute resolution at the Houston BBB, who testified that as of December 2006, the Houston BBB had received over 782 complaints in the preceding 36 months against TeleCheck. Holmes also submits the affidavit testimony of Carol Ritter, the vice president of operations and bureau standards, who stated that TeleCheck is the number one business receiving complaints with the Houston BBB for several years running. Ritter testified that the Houston BBB has received hundreds of complaints since 2003 related to TeleCheck's failure to respond to consumer inquiries, and that the problem became so significant that in 2004, a meeting was held between the BBB and TeleCheck representatives "over a growing pattern of complaints that we were starting to see in 2004 regarding denials. Also, we were concerned with the -- the customer's summaries of having

45

difficulty getting through the TeleCheck system for assistance."  (Docket No. 352, Tabs 33 and 34, at pp. 42-44).

Plaintiff contends that to prove a willful violation of the FCRA, these affidavits are relevant to establish a "pattern and practice" of violating the FCRA, as opposed to an isolated incident involving Holmes.  Holmes wishes to use this evidence to show that TeleCheck's refusal to provide file disclosures is not isolated to her, but the routine mode of operation to do everything in its power to avoiding providing information.

Plaintiff argues that the *Safeco* ruling does not eliminate the relevance of pattern and practice proof.  The Court agrees.  Proof of a pattern and practice is relevant and is one way to establish willfulness.  *See Dalton v. Capital Associated Indus., Inc*., 257 F.3d 409, 418 (4th 2001)(recognizing that evidence of "other consumers [who] lodged complaints similar to [plaintiff] can be relevant in attempting to prove willfulness under the FCRA).  In *Boris v. Choicepoint Servs., Inc.*, 249 F. Supp.2d 851 (W.D. Ky. 2003), the court allowed a plaintiff alleging FCRA violations to discover numerous complaints and questions from other consumers as well as introduce at trial a 684-page exhibit of the complaints or questions of other consumers.  *Id.* at 863.  In so doing, the court noted that the 684-page exhibit was "broadly relevant to show the types of complaints [defendant] received, how those complaints were processed and the [defendant's] knowledge of complaints generally."  *Id*.

Willfulness under the FCRA is generally a question of fact for the jury.  *See Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995)("The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases."); *Cahlin v. Gen. Motors Acceptance Corp*., 936 F.2d 1151, 1156 (11th Cir.

46

1991); *Lenox v. Equifax Info. Servs*. LLC, 2007 WL 1406914, *6 (D. Or. May 7, 2007)("the determination as to whether defendant's action or inaction rises to the level of willfulness so as to violate the statutory obligations of the FCRA is also a question of fact"); *Centuouri v. Experian Info. Solutions, Inc.*, 431 F. Supp.2d 1002, 1007 (D. Ariz. 2006)(declining to enter summary judgment on the issue of wilfulness in a case involving the reasonableness of consumer protection procedures).   To determine that willfulness does not present a jury question in this case, the Court would have to conclude that no reasonable jury could find that TeleCheck's conduct created a "risk [of FCRA violation] substantially greater than that which is necessary to make [its] conduct negligent." *See Safeco*, 127 S. Ct. at 2215.  This the Court cannot do based upon the record currently before it.

Drawing all inferences in favor of Holmes, the Court concludes that triable issues of fact remain regarding whether TeleCheck acted willfully.  For example, a reasonable jury could conclude that TeleCheck failed adequately to train its employees on the requirements of the FCRA and that TeleCheck's procedures for handling and investigating consumer disputes posed an "unjustifiably high risk" that TeleCheck would violate the FCRA. *Safeco*, 127 S. Ct. at 2215. As in *Boris*, this is not a case where there are allegations of an isolated instance of human error which TeleCheck promptly cured, or where, upon discovery, TeleCheck quickly took ameliorative action. *See* 249 F. Supp.2d at 862 (finding that "there was ample evidence from which a reasonable person could find [defendant] "knowingly and intentionally committed and act in conscious disregard for the rights of others.").  For instance, Plaintiff contends and provides evidence that she *still* has not received a complete copy of her TeleCheck file.    In any

event, there is certainly sufficient evidence, albeit disputed by the defendants, from which a reasonable jury could conclude that TeleCheck negligently or willfully violated the FCRA.

### 10. Holmes' Request for Declaratory and Injunctive Relief

TeleCheck contends that the Court should dismiss Holmes' request for a declaratory judgment and permanent injunction because such remedies are not available to private litigants under the FCRA. TeleCheck's argument is that because the statute explicitly allows for injunctive relief for the FTC, if Congress had intended for private plaintiffs to have that remedy available, it would have included that in the statute specifically. Holmes argues that whether injunctive relief is available under the FCRA is an unsettled issue that has not been addressed by the Sixth Circuit.

Sections 1681n and 1681o set forth the potential civil liability for noncompliance with the FCRA. Neither section provides for injunctive relief.

The Fifth Circuit is the only Circuit to have addressed the issue at hand. In *Washington v. CSC Credit Servs., Inc.*, 199 F.3d 263 (5th Cir. 2000), the Fifth Circuit considered the express language of the FCRA, canons of statutory construction, the affirmative grant of power to the FTC to pursue injunctive relief, and the absence of a similar grant to private litigants, and held that injunctive relief is not available to private litigants. *Id.* at 268. The Court reasoned that "where Congress intended to allow private injunctive relief under the FCRA, it expressly stated that this relief was available. This language would be unnecessary if injunctive relief were otherwise available." *Id.* at 269.

*Washington* observed that lower courts are split as to whether the FCRA allows private litigants to maintain a claim for injunctive relief. *Id.* at 268. *Washington* has since become the

leading case on this issue. *See Young v. HSBC Mortgage Servs., Inc.*, 2007 WL 2083680, at \*1 (E.D. Mo. 2007)(stating "[I]t has been well settled that injunctive relief is not available to private plaintiffs under the FCRA.")(citations omitted).

At least two district court cases from within the Sixth Circuit have observed that this issue has not been addressed by the Sixth Circuit. *See Presley v. Equifax Credit Informational Servs., Inc.,* 2006 WL 2457978, \*2-3 (E.D. Ky. 2006) and *Lewis v. Ohio Prof'l Elec. Network, LLC*, 248 F. Supp.2d 693, 704 (S.D. Ohio 2003). The *Lewis* court deferred on the injunctive relief issue and decided the case on other grounds. The more recent case adopted the Fifth Circuit's reasoning in *Washington*, finding it "compelling" and "the more direct approach." *Id.* at \*2. This Court agrees and finds that the better view is that injunctive relief is not available to private litigants under the FCRA.

The cases relied upon by Plaintiff do not otherwise persuade the Court. *Crabil v. Trans Union LLC*, 259 F.3d 662, 665 (7th Cir. 2001), mentions in dicta that a plaintiff may be able to obtain injunctive relief, but does not analyze the issue in any meaningful way. *See Presley*, 2006 WL 2457978, at \*3 (finding *Crabil* not to be persuasive support for the plaintiff's position). Likewise, although the issue was specifically recognized by the Court in *Albert v. Trans Union Corp.*, 346 F.3d 734 (7th Cir. 2003), it was not addressed because the Court determined it lacked jurisdiction to hear the interlocutory appeal. *Id.* at 736; *see Presley*, 2006 WL 2457978, at \*3 (finding *Albert* unpersuasive authority).

Accordingly, Holmes' request for declaratory and injunctive relief fails as a matter of law, and this claim will be dismissed.

**11. Dismissal of TeleCheck International, Inc.**

49

Defendant TeleCheck International, Inc. ("TII") represents that it is only a holding company that owns TeleCheck. According to TII, it did not act as a "consumer reporting agency" with respect to Holmes' transactions. TII maintains that it did not enter into service contracts with any of the four merchants in this case and that Plaintiff has provided no evidence that TII played any role in the check transactions at issue in this case.

In response, the Plaintiff alleges that TeleCheck, International, Inc. is a "consumer reporting agency" and that its operations with TeleCheck Services, Inc. are so commingled as to render them inseparable. Plaintiff has adduced evidence that both Defendants utilize the same employees and infrastructure; that TII engages in check verification and guarantee services; that TII bills merchants for these services; that TII is directly involved with the approval of consumer checks and updating consumer files in Defendants' database; that TII is involved in the approval of future checks; and that TII is involved in the collection of returned checks to merchants that are forwarded to Defendants under their check guarantee service. The Court finds that Plaintiff has carried her burden to avoid summary judgment on this issue.

### V.    Conclusion

Defendants' request for oral argument (Docket No. 347) will be denied. Defendants' renewed Motion to Strike and/or Exclude Third Party Checkwriter Affidavits (Docket No. 342) will be denied as moot.

Defendants' Renewed Motion to Strike and/or Exclude Documents from the Houston Better Business Bureau ("BBB") (Docket No. 343) will be denied. In particular, as to the BBB records of complaints filed by other checkwriters, the motion will be denied as moot. The Court did not consider these documents in ruling on the parties' cross-motions for summary judgment. However, as to the documents sent by TeleCheck to the BBB, the motion will be denied. The

50

documents were considered by the Court only in considering whether Defendant TeleCheck International, Inc. is a "consumer reporting agency" under the relevant statute.

Defendants' Renewed Motion to Strike and/or Exclude Plaintiff's Supplemental Affidavit and Second Supplemental Affidavit (Docket No. 344), the Affidavit of Julia Trotman (Docket No. 345), and the Expert's Supplemental Report (Docket No. 346) will be denied.

For the reasons explained herein, Defendants' Renewed Motion for Summary Judgment (Docket No. 329) will be denied in part and granted in part. Plaintiff's Renewed Motion for Summary Judgment (Docket No. 349) will be denied.

With respect to the parties' cross-motions for summary judgment, the Court specifically finds that a genuine issue of material fact exists as to the following Fair Credit Reporting Act claims, and these claims shall proceed to trial against *both* Defendants: Subparts 3-8 of Holmes' claim under 15 U.S.C. § 1681e(b), the "inaccuracy of information/failure to follow reasonable procedures" claims based on the "Code 3s" issued to merchants in 2005; Subparts 1-2 of Holmes' claim under § 1681g(a), the "file disclosure" claims, excluding those theories set forth below; Subparts 3, 4, and 7 of Holmes' claim under § 1681i, the "reinvestigation" claims; and Subpart 9 of Holmes' claim under § 1681h(c), the "inadequate staffing and training" claim.

Plaintiff may pursue statutory and punitive damages based on Defendants' alleged willful violations as set forth above.

The following claims will be dismissed: Subparts 3-8 of Holmes' claim under 15 U.S.C. § 1681e(b), the "inaccuracy of information/failure to follow reasonable procedures" claims based on the codes issued to merchants in 2003 and 2004; Plaintiff's "file disclosure" claims under § 1681g(a) based on Defendants' failure to provide reasons for issuing the "Code 3s" to merchants and the inaccuracy of the file disclosure provided directly to Holmes; Subpart 10 of Holmes'

claim, the "improper request of information" claim; Subpart 11 of Holmes' claim, the "wrongful dissemination of information" claim; and Plaintiff's purported "failure to include a 'Summary of Rights'" claim under § 1681g(c)(2).

In addition, Plaintiff's request for declaratory and injunctive relief will be denied.

An appropriate Order will enter.

_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE